## LENT *v.* LENT
### (Two Appeals in One Record)
[No. 122, October Term, 1952.]

*Decided April 17, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Susan Jane Hendershott* for the appellant.

No brief and no appearance for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

Mary Jane Adams Lent, of Bethesda, has appealed here from a decree of the Circuit Court for Montgomery County, which dismissed her amended cross-bill for a divorce *a vinculo matrimonii* from her husband, Worthington C. Lent, a consulting engineer, also of Bethesda. Appellee had instituted suit for a divorce, and the decree also dismissed his bill. He also appealed, but since he did not file a brief in this Court his appeal will be dismissed. Rule 40 of our Rules relating to Appeals provides that within 30 days after the filing of the transcript of the record in this Court, counsel for the appellant shall file 40 copies of the printed brief; and when an appellant fails to comply with this rule, the case may be dismissed on motion or by the Court of its own motion.

The parties were married in the District of Columbia in September, 1944. The bride was 22, the groom 42. It was the bride's first marriage, the groom's third. The groom's previous marriages had ended in divorce. The parties have two children, a daughter born in 1945 and a son born in 1948.

In September, 1950, appellee entered the United States Air Force with the rank of Lieutenant Colonel. The parties separated on August 15, 1951, and appellee entered suit for a partial divorce on September 14, 1951. It was testified that appellee's income was $618 per month. The Court ordered him to pay $57.50 per week

as alimony *pendente lite* and for the support of the children.

Appellant testified at the trial that her husband lost all interest in her after the birth of their first child, and that after he entered the Air Force he repulsed all her efforts to have marital relations with him. She declared that he swore he would never touch her again, and that he had refused to have sexual intercourse with her since September, 1950. On the other hand, appellee claimed that it was not until May, 1951, that he terminated marital relations. However, he admitted that he did not want children, claiming that his financial condition did not warrant having any more. He called his wife "careless" when she became pregnant in 1948.

Appellant testified that her husband called her "lousy rat," "bitch," and other vile names. Her witnesses corroborated her testimony that he called her offensive names in the presence of their children, and that her "hysterical, upset condition" had reduced her to a "nervous wreck." Appellant further testified that while she was washing clothes in the basement of their home in Bethesda one evening in the summer of 1951, her husband struck her and threatened to kill her, so that it was necessary to call the police for protection.

Appellant further testified that on August 15, 1951, her husband treated her so harshly that she feared he would kill her. After calling the police again, she fled with the two children to the home of her mother in Washington. Appellee testified that he did not call his wife a "prostitute," but merely told her she was "acting like a prostitute." Appellant stayed with her mother until December, when she moved back into Montgomery County. She charged her husband with constructive desertion, alleging that she was compelled to leave him because of his intolerable conduct. She declared that she left "in mortal terror."

The chancellor stated that he was not convinced that appellee was guilty of cruelty or that his wife left him because of fear. He accordingly dismissed both the

bill and the cross-bill; authorized appellee to discontinue paying alimony *pendente lite;* awarded the custody of the children to appellant, with the right of appellee to have the children visit him each Saturday afternoon; and ordered appellee to pay $40 per week for the support of the children.

While appellant testified in the Court below that her husband had refused to have intercourse with her since September, 1950, she conceded in her brief and also in the oral argument in the Court of Appeals that there was no corroboration of her claim that the refusal to cohabit commenced in September, 1950, and therefore she did not ask immediately for a divorce *a vinculo matrimonii.* The Maryland divorce statute authorizes a decree of divorce *a vinculo matrimonii* on the ground of abandonment when the abandonment has continued uninterruptedly for at least eighteen months, and is deliberate and final, and the separation of the parties is beyond any reasonable expectation of reconciliation. Laws 1949, ch. 520; Code 1951, art. 16, sec. 33. Appellee admitted that there has been no cohabitation since May, 1951, and appellant's cross-bill, which prayed for a divorce *a vinculo matrimonii* was filed in March, 1952. But appellant says that she is entitled to a divorce *a mensa et thoro.* We agree with her contention. The statute provides that where a divorce *a vinculo matrimonii* is prayed, the court may decree a divorce *a mensa et thoro* if the evidence supports such a decree. Code 1951, art. 16, sec. 34; *Downs v. Downs,* 154 Md. 430, 434, 140 A. 831.

It is the law of this State that permanent refusal of either the husband or the wife to have sexual intercourse with the other spouse, from no consideration of health or other good reason, constitutes matrimonial desertion, although the parties continue to live in the same house. *Fleegle v. Fleegle,* 136 Md. 630, 110 A. 889; *Miller v. Miller,* 153 Md. 213, 138 A. 22; *Timanus v. Timanus,* 177 Md. 686, 10 A. 2d 322; *Kelsey v. Kelsey,* 186 Md. 324, 46 A. 2d 627. Of course, the com-

plainant has the burden of proving the allegation that the defendant refused to fulfill the marital duty. But where the possibility of collusion is precluded, only slight corroboration is required. Code 1951, art. 35, sec. 4; *Harp v. Harp,* 198 Md. 485, 84 A. 2d 895.

The chancellor refused to grant appellant a divorce *a mensa et thoro,* saying he was not convinced that her husband had made up his mind "not to have intercourse with her again and thus bring the marriage to an end." We think the evidence amply supports appellant's allegation that her husband refused cohabitation unjustifiably and permanently. Appellant declared that her husband lost all affection for her within a year after they were married. The chancellor, believing her, commented: "The evidence seems clear that Colonel Lent was not interested in entertaining his young wife. He spent much of his spare time playing cards and golfing. She craved attention and companionship. This he gave her sparingly and with some disdain."

In the fall of 1950 or the spring of 1951, appellee refused to have marital relations with his wife. He admitted at the trial that he told Mrs. Bernice Blair several weeks after his wife left him that he had not had any sexual relations with his wife since May, 1951. His whole attitude, as shown by his conduct as well as his statements to others, proves conclusively that he determined never to resume marital relations with his wife. Miss Katherine di Cessare, directress of the Woodlawn School, which the two children attended, testified that appellee told her he was determined upon getting a divorce, giving as his complaint that she spent too much money.

Appellee testified that, at the time of their quarrel one evening in the summer of 1951, he urged his wife not to leave home; but apparently he did so principally because he wanted someone to look after the children. He admitted on the stand: "I was thinking about the children, that is all. And I took the wedding ring, when

I saw it served no useful purpose, took the wedding ring off, and laid it on the corner of the ironing board, and said: 'Here, Mary you have it. It's all yours.'"

The fact that appellee's conduct became increasingly reprehensible, until he finally likened his wife to a prostitute, confirms our opinion that he had no intention of resuming marital relations. It is our opinion that appellant was justified in leaving the home with the children and taking refuge in her mother's home. The chancellor, in commenting on appellee's harsh treatment of his wife, said: "It was his duty to change his attitude and conduct. To grant him a limited divorce would put a premium on indifference, harshness and neglect." It is well established that any misconduct of the husband will justify the wife in leaving him and entitle her to a divorce on the ground of constructive desertion when it makes it impossible for her to live with him without loss of her health or self-respect, or gives her reasonable apprehension of bodily injury. *Scheinin v. Scheinin*, 200 Md. 282, 89 A. 2d 609. But it is actually unnecessary to rely on the additional ground of constructive desertion alleged by appellant in her amended cross-bill.

After appellant separated from her husband, he hired detectives to show that she renewed her friendship with a man she had known since she was 14. The chancellor remarked that she was very indiscreet, but he was firmly convinced that she was not guilty of adultery. As we have said, appellee did not comply with the rules of this Court, and his appeal will be dismissed. Our conclusion, therefore, is that appellant is entitled to a divorce and alimony.

We accordingly reverse that part of the decree which dismissed appellant's cross-bill and allowed appellee to discontinue paying alimony, and direct the chancellor to grant appellant a divorce *a mensa et thoro* and to order appellee to pay alimony in such amount as the chancellor shall find proper.

We affirm that part of the decree which awarded the custody of the children to appellant and ordered appellee to pay $40 per week for their support.

> *Decree reversed in part and affirmed in part, and case remanded for the passage of a decree in accordance with this opinion, with costs to appellant.*