COMULADA *v.* COMULADA

[No. 210, September Term, 1963.]

*Decided April 6, 1964.*

The cause was argued before HAMMOND, PRESCOTT, HOR-NEY, MARBURY and SYBERT, JJ.

*Stedman Prescott, Jr.,* for appellant.

*William A. Ehrmantraut,* with whom were *Edward C. Dona-hue* and *John J. Mitchell* on the brief, for appellee.

HORNEY, J., delivered the opinion of the Court.

When the wife, Margaret G. Comulada, filed an action for separate maintenance for herself and custody of and support for the minor children, the husband, Edward V. Comulada, filed, first, a cross-bill for a divorce *a mensa et thoro* and, later, a supplemental cross-bill for a divorce *a vinculo matrimonii* alleging constructive desertion as a result of cruelty and violence. The chancellor dismissed the wife's bill insofar as alimony was concerned (but retained it for the purpose of awarding custody of and support for the children) and granted the husband a divorce *a vinculo matrimonii* on the ground of constructive desertion. On this appeal by the wife, it is contended: (i) that the evidence was insufficient to corroborate the testimony of the husband; (ii) that there was insufficient evidence of cruelty and violence to warrant granting the husband an absolute divorce on the basis of constructive desertion; and (iii) that the wife is entitled to alimony.

The parties were married in 1955 and, except for a two year period the husband was in the armed services, they lived together, first in Oakland, and then in Tacoma Park, until the husband moved out of the marital home in 1961. The husband, a dentist by profession, has practiced privately except for the time he was in the army. Two children, a boy and a girl, were born as a result of the marriage.

The marriage had been a turbulent one almost from the beginning. They quarreled on the way home from their honeymoon. There were minor differences between them when they were living in Oakland. But the difficulties, which eventually brought about the separation, began when the husband went into the service.

The wife, because she believed her husband was not faithful to his marriage vows, has accused him of "running with other women" ever since they were married. While they were living in Oakland she accused him of having an illicit relation-

ship with his dental assistant. During the two years he was at the Walter Reed Hospital, she stated he came home with lipstick on himself and his clothing and with compacts in his car which were not hers. After he was discharged from the army and had resumed private practice in an office in his home, the marital difficulties became more intensified. The wife further accused her husband, prior to their separation and in court, of having illicit relations with every woman with whom he came in contact, with his women patients, and even with her own sisters, and intimated that he was having unnatural relations with their three-year old son. She admitted that she had never actually caught her husband engaged in an illicit affair with anyone but insisted that she knew such affairs were going on. The husband, however, categorically denied that he had ever been unfaithful and said that he had never had any inclination to do so.

The wife also testified that her husband often neglected her, that he clothed her inadequately, that he rarely ever kissed her and frequently slept in a separate bedroom, that he was more attentive to his mother than he was to his wife and children and that he would go to dentists' meetings with a woman doctor who was a former classmate and sweetheart. She also suggested that her husband had drugged her and tried to poison her.

There is nothing in the record to support any of the accusations made by the wife against the husband. And, other than the testimony of the wife's father that she was not properly dressed at a public ceremony she and her husband attended, there was no substantiation of her complaints. There was testimony, however, by her father and a neighbor, that she had been a good wife and mother and that there was no justification for the husband to leave the home when he did. There was also testimony that the husband had left the marital home several times. Previous separations had been terminated by reconciliation, but the final separation, on October 1, 1961, has not been reconciled, despite the efforts of the wife to bring about another reconciliation.

The opposite side of the story presents a different version of the marital difficulties. The husband testified that on many occasions before the final separation, and thereafter, his wife

threatened to take his life. She had threatened more than once to beat his brains out with heavy cooking utensils she held over his head. Other threats had been made with an ax. She had said on several occasions when she had a knife in her hand that she would cut his guts out. At other times she had struck him with her fists, scratched him with her finger nails, kicked him, and, on one occasion, had knocked his glasses off and caused bruises and cuts about his eyes. During the course of some of her violent rages, she had destroyed chinaware and other household articles and some of her husband's personal effects and furnishings. According to the husband, it was these and other incidents which caused the final separation.

The husband also testified that his wife frequently disrupted and interfered with the peaceable practice of his profession. Both in the former office in his home and in the new office he acquired after the separation in an effort to avoid such disturbances, his wife would start arguments with him or make comments to him in the presence of his patients that caused the husband considerable embarrassment and humiliation which, according to him, eventually became unbearable. As an example, the husband cited an incident that occurred in the former office when his wife called him a bum before his patients and, indicating a female patient, asked him if she was another of the women he was running around with. The wife admitted that there had been physical violence between her husband and herself on several occasions, and when she was asked on redirect what had happened on those occasions the husband had testified that she had assaulted him, she did not deny the charges, but replied that her husband had always struck her first.

The corroborating testimony of the witnesses called by the husband was thin and lacked substantiating force. His brother, who had observed that some of the personal belongings of the husband had been destroyed, testified that he had seen the wife assault the husband while he was attempting to remove the remainder of his personal effects and furnishings from the marital home, but that was after the husband had decided to leave. A sister-in-law of the husband also described in detail an embarrassing comment made to her by the wife in the office waiting room prior to the last separation at a time when

other patients were present, but it does not appear that the husband was present, or had any knowledge of the spectacle the wife had exhibited. Lastly, there was also the testimony of the wife's two sisters, whom she had accused of having sexual relations with her husband, denying that anything like that had ever happened, but the record does not show whether the husband was aware of such accusations before the final separation had taken place.

### (i) and (ii)

The first and second questions presented by the appeal relate to the requirements of corroboration in divorce cases.

Maryland Rule S75, which became effective January 1, 1962, provides that:

> "A final decree of divorce [1] shall not be passed upon the testimony of the plaintiff alone, [2] nor shall the admissions of a defendant in an action for divorce be taken of themselves as conclusive proof of the facts charged as the ground of the action, but [3] in all cases testimony of a person not a party in corroboration of the plaintiff shall be required."

In substance, Rule S75 embraces a part of § 4 of Art. 35 and all of former § 32 of Art. 16 of the Code of 1957. The first and third clauses of the rule—to the effect that a divorce may not be granted on the testimony of the plaintiff alone and that the testimony of a witness other than a party is required to corroborate the testimony of the plaintiff—are in the main declaratory of those parts of § 4 of Art. 35, presently providing in relevant part that "in suits, actions, bills or other proceedings instituted in consequence of adultery, or for the purpose of obtaining a divorce, * * * no * * * judgment or decree [shall] be entered upon the testimony of the plaintiff alone; but in all cases testimony in corroboration of that of the plaintiff shall be necessary." And the second clause—to the effect that the admission of a defendant may not be taken of itself as conclusive proof of the facts alleged as the ground for divorce—is derived from the now repealed § 32 of Art. 16, which formerly provided that "the admission of a respondent, of the facts charged in a bill of divorce, who consents to the application,

shall not be taken of itself as conclusive proof of the facts charged, as the ground of the application."

The present rule requires that there be corroboration of the testimony of the plaintiff whether the action for divorce is contested or not.

Prior to the adoption of Rule S75, the statutory provisions called for a less strict requirement of corroboration than does the present rule.

All of the cases hold that the testimony of the plaintiff must be corroborated and that corroboration cannot be dispensed with altogether. See, among others, *Twigg v. Twigg,* 107 Md. 676, 69 Atl. 517 (1908); *Tomkey v. Tomkey,* 130 Md. 292, 100 Atl. 283 (1917); *Jacobs v. Jacobs,* 170 Md. 405, 185 Atl. 109 (1936); *Smith v. Smith,* 225 Md. 282, 170 A. 2d 195 (1961). But in contested cases, where there is no possibility of collusion, it has been consistently held that only slight evidence is required to corroborate the testimony of the complaining spouse. See, for example, *Heinmuller v. Heinmuller,* 133 Md. 491, 105 Atl. 745 (1919); *Roeder v. Roeder,* 170 Md. 579, 185 Atl. 458 (1936); *Harp v. Harp,* 198 Md. 485, 84 A. 2d 895 (1951); *Lee v. Lee,* 220 Md. 325, 152 A. 2d 561 (1958).

In some cases, such as *Kremelberg v. Kremelberg,* 52 Md. 553 (1879) and *Fassett v. Fassett,* 143 Md. 35, 121 Atl. 859 (1923), decrees of divorce were granted on evidence consisting largely of admissions of adultery. In at least two cases, *Maranto v. Maranto,* 192 Md. 214, 64 A. 2d 144 (1949) and *Cullotta v. Cullotta,* 193 Md. 374, 66 A. 2d 919 (1949), it was stated, without any qualification as to its trustworthiness, that the corroboration required may be found in evidence of admissions by the other spouse. But in other cases in which it was held that admissions were acceptable as corroborative evidence, it was further pointed out that such evidence, unsupported by other proof, should be received with utmost circumspection and caution. See *Schriver v. Schriver,* 185 Md. 227, 44 A. 2d 479 (1945); *Zulauf v. Zulauf,* 218 Md. 99, 145 A. 2d 414 (1958).

In the case at bar, we think the testimony relied on to substantiate that of the plaintiff was clearly insufficient to warrant

the chancellor finding that the wife had constructively abandoned or deserted the husband. Not only did the husband fail to produce such other testimony as was required to corroborate his own, but, even if it is assumed, without deciding, that the failure of the wife to deny the testimony of the husband—to the effect that she had assaulted him on several occasions—amounted to an adoptive admission, such admission of itself was not enough to conclusively prove the desertion charged in the cross-bill as a ground for divorce. The decree, therefore, insofar as it granted the husband a divorce *a vinculo matrimonii* must be reversed.

### (iii)

The chancellor also erred in dismissing the bill of the wife for separate maintenance. The husband concedes that it was he who left the marital home and that it is his intention not to return even though the wife is willing to resume the marital relationship, and there was corroboration of these facts. Under these circumstances, it is apparent—since it was she (and not the husband) who was abandoned—that the wife is entitled to alimony for her separate maintenance. *Dearholt v. Dearholt,* 178 Md. 405, 13 A. 2d 538 (1940). Cf. *Moran v. Moran,* 219 Md. 399, 149 A. 2d 399 (1959). The case, therefore, insofar as it concerns the allowance of alimony, will be remanded, without affirmance or reversal, for the entry of an order reinstating the bill for separate maintenance and for such further proceedings as may be necessary to ascertain the amount of alimony the husband should pay the wife. Rule 871 a.

> *The decree, insofar as it granted the appellee a divorce a vinculo matrimonii, is reversed. The case, insofar as it concerns the allowance of alimony to the wife, is remanded without affirmance or reversal for such further proceedings as are required by this opinion; the costs to be paid by the appellee.*